1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

ROBERTO ROBLES,

        Plaintiff,

    v.

E. NGUYEN,

        Defendant.

No.  2:19-CV-1538-KJM-DMC-P

<u>FINDINGS AND RECCOMMENDATIONS</u>

Plaintiff, a prisoner proceeding pro se, brings this civil rights action pursuant to 42 U.S.C. § 1983.  Pending before the Court is Defendant Nguyen's unopposed motion for summary judgment, ECF No. 25.  Plaintiff's single claim alleges that Defendant Nguyen was deliberately indifferent to Plaintiff's serious medical needs.  <u>See</u> ECF No. 1, pg. 3.  Defendant Nguyen contends that he was not deliberately indifferent to Plaintiff's serious medical needs and that he is entitled to qualified immunity.  <u>See</u> ECF No. 25-2, pg. 1.

**I. BACKGROUND**

This action proceeds on Plaintiff's original complaint.  <u>See</u> ECF No. 1.  Plaintiff named Dr. Nguyen as the sole defendant.  <u>See id.</u>  Plaintiff alleges that his Eighth Amendment rights were violated by Defendant Nguyen for delaying medical care.  <u>See id.</u> at 4.

/ / /

1

1    Plaintiff states the following:

2    I've been experiencing severe issues with, "pressure sores" for some
     time now at California Health Care Facility. . . .  On January the first
3    2018, I seen [sic] Dr. Dove, orthopedics.  His recommendation at the
     time was for general surgery, for both a (reflipping) [sic] and a
4    (wound debridement) [sic].  Since that consultation with Dr. Dove,
     CHCF Medical has scheduled two appointments.  However, against
5    Dr. E. Nguyens [sic] orders to arrange special transportation (i.e.
     ambulance), CHCF instead arranged a "custody van" for the purpose
6    of this transportation.  This particular van would have had me sitting
     vertically (upright) for extended periods of time.  This action could
7    have caused additional pain and trauma with my "pressure sores",
     my hip, hip joint, and pelvis.  Both scheduled appointments were
8    cancelled by CHCF Medical causing me extreme delays with my
     medical care, which has caused additional medical problems (i.e.
9    emergency transport to San Joaquin County Hospital osteomyelitis
     and blood infection, etc.).  This infection on my "pressure sores" has
10   spread from my hip, to my hip join [sic], and to my pelvis area.  A ct
     scan was performed, in 2019 my abdomen showed changes of ostium
11   mellitus of my left pelvic area, involving inferior pubic rumus.

12   The duration of these issues has led to additional level of pain and
     suffering not addressed by Dr. E. Nguyen, seen by him one to three
13   times a week.  Every single time I have expressed deep concern that
     this pain level, and the limited types of medication and level of
14   medication given to me was seriously in affected [sic]. I believe the
     above information, on constant medical delays which Dr. E. Nguyen
15   has not adequately addressed, has deeply affected my daily activities.

16   Due/because of delays of medical care at CHCF, and ignoring the
     recommendations of the outside orthopedics concerning my
17   "pressure sores", now my pelvis has been affected, and due to this
     delay, has created substantial levels of pain and suffering caused by
18   Dr. E. Nguyen and his lack of adequate medical care for these serious
     problems.
19

20   Id. at 3-4 (errors in original).

21

22                                **II. DEFENDANT'S EVIDENCE**

23            Defendant's motion is supported by a sworn declaration from Defendant Nguyen,

24   Peter D. Lewicki, and B. Feinberg.  See ECF No. 25-4, 5, and 6.  Defendant relies on the

25   following exhibit attached to the declaration of Defendant Nguyen:

26
                       Exhibit A          Medical Records and Chart Notes.  ECF
27                                        No. 25-6, pgs. 15-177.

28   ///

                                            2

Defendant also relies on the following exhibit attached to the declaration of Peter D. Lewicki:

> Exhibit A        Plaintiff Robles's Deposition Transcript.  ECF No. 25-5, pgs. 3-15.

Defendant also relies on the following exhibit attached to the declaration of B. Feinberg:

> Exhibit A        Curriculum Vitae of Dr. B. Feinberg. ECF No. 25-4, pg. 18.

Further, Defendant Nguyen properly includes a Statement of Undisputed Facts alongside his motion for summary judgment in which she states the following facts are undisputed:

1.      Plaintiff Roberto Robles is an inmate in the custody of the California Department of Corrections and Rehabilitation (CDCR).

2.      At all times relevant to this lawsuit, Plaintiff was incarcerated at California Health Care Facility (CHCF).

3.      As of November 6, 2020, Plaintiff has not received any medical training, nor has he worked in the medical field.

4.      Defendant Dr. E. Nguyen has been a licensed and practicing physician since 2006, and has been employed by CDCR at CHCF as a Physician and Surgeon.  Defendant is board certified by the American Board of Family Medicine.

5.      At all relevant times to this lawsuit, Defendant was a Physician and Surgeon at CHCF.

6.      Defendant generally does not perform surgeries, nor are surgeries generally performed at CDCR institutions.

7.      In his professional capacity, Defendant has treated patients with chronic pain, decubitus ulcers, and osteomyelitis.  Defendant also consults with, and relies upon the reports and recommendations of other skilled health care professionals, including plastic surgeons.

8.      CDCR provides medical services for patient-inmates that are based on medical necessity and supported by data.  In the absence of available data for a specific case, treatment is based on the judgment of the physician that the treatment is considered effective, and is supported by both diagnostic information and consultations with appropriate specialists.  Further, if a CDCR physician believes an inmate needs specialized service not provided by the institution, the physician must complete a Physician Request for Services form.  The

3

Chief Physician may authorize or deny the request, or may request additional justification.

9.      Inmates may not demand particular medication, diagnostic evaluation, or courses of treatment.

10.     Plaintiff was paralyzed from a gunshot in 2007, prior to his incarceration.  Plaintiff is dependent on a wheelchair.

11.     Prior to his incarceration, Plaintiff took Norco, an opioid pain reliever.  He also took Soma, a muscle relaxant.

12.     During the time relevant to this lawsuit, Plaintiff was housed in a critical care housing unit at CHCF.

13.     Prior to his treatment by Defendant, Plaintiff was treated by other physicians, including a wound care team.

14.     Plaintiff's wound care was to address a decubitus ulcer, commonly referred to as a "bed sore" or "pressure sore."  A decubitus ulcer is an injury to the skin and underlying tissue caused by prolonged pressure from sitting or lying down, and a restriction in blood flow.  Decubitus ulcers are common in patients dependent on a wheelchair, and often develop in [sic] the tailbone and spine due to contact with the chair.  Decubitus ulcers vary in severity, and are classified in four stages.  The most severe is stage four, which may be so deep that the ulcer impacts the underlying muscles and/or bone.  Severe ulcers may require skin grafts, which involves plastic surgery.

15.     Plaintiff's decubitus ulcer was rated as stage four, the most severe.  Treatment to Plaintiff's wound included cleaning with gauze, placement of a dressing, and occasional draining.    Plaintiff underwent wound care procedures twice to three times daily.

16.     Prior to his treatment by Defendant, a surgeon in Bakersfield Memorial Hospital, Dr. Dev[1], performed a bone debridement to treat Plaintiff's osteomyelitis.  Osteomyelitis is an infection of the bone.  Symptoms can include fever, swelling, pain and fatigue, or present no symptoms at all.

17.     Prior to his treatment by Defendant, Plaintiff was previously prescribed acetaminophen with codeine (a narcotic) and a Neurontin[2] to treat pain from these conditions.

18.     Prior to his treatment by Defendant, Plaintiff was awaiting a plastic surgery appointment, at the recommendation of Dr. Dev.

19.     On June 15, 2018, Defendant began treating Plaintiff.  In this encounter, Defendant discussed Plaintiff's pain management treatment with him.  Plaintiff was already prescribed and taking acetaminophen with codeine, and Neurontin.  Defendant determined that escalation in narcotics was not appropriate.

---

[1] Dr. Dev is also referred to as "Dr. Dove" in Plaintiff's deposition and complaint.
[2] Neurontin is also referred to as "Gabepentin."

4

20.     On June 19, 2018, Defendant requested a CT scan and general surgery to treat Plaintiff's chronic osteomyelitis and decubitus ulcer, and to assess future care of these conditions. Defendant also counseled Plaintiff on pain management options, and offered tricyclic medication.  Plaintiff declined tricyclic medication. The requests for CT scan and surgery were initially denied by other personnel at CHCF.

21.     On June 27, 2018, Plaintiff declined an offer for sulindac, an anti-inflammatory pain reliever.

22.     On July 20, 2018, Defendant conferred with Nurse Practitioner Sanez Martin to assess the proposed CT scan of the abdomen and pelvis, and referral for surgery.

23.     On July 24, 2018, Defendant encountered Plaintiff. Defendant informed Plaintiff of the plan to seek reconsideration of the denial of the CT scan and outpatient surgery.  Plaintiff reported that his pain was stable.

24.     While awaiting a determination on the request for outpatient surgery, Defendant met with Plaintiff during several encounters, and addressed his pain management, renewed wound care orders. Additionally, Defendant consulted with Plaintiff's wound care team, and secured a CT scan for Plaintiff.  On August 24, 2018, a review of the CT scan findings confirmed osteomyelitis in the left pelvis.

25.     On August 28, 2018, Defendant met with the CHCF chief physician to discuss plans for Plaintiff's care, and the request for surgical consultation was approved.  Plaintiff was taken that same day to San Joaquin General Hospital (SJGH) to assess for antibiotics and a surgery consultation.  SJGH informed Defendant that it did not perform those types of surgical procedures.

26.     On three encounters between September 5, 2018 and September 14, 2018, Defendant met with Plaintiff to discuss his pain, and the pending referral for surgery.  On September 5, 2018, Defendant renewed Plaintiff's acetaminophen with codeine prescription. On September 14, 2018, Plaintiff was informed that his surgery appointment would be held in Bakersfield.  Defendant requested transportation by ambulance due to the three-hour travel time, to prevent unnecessary pain to Plaintiff.  Defendant can request an ambulance, but the arrangements are made by appointment schedulers.

27.     Plaintiff informed Defendant on October 10, 2018 that he refused to attend his surgical consultation in Bakersfield due to a custody van being ordered for transportation, rather than an ambulance, and his concerns about pain from sitting on his pressure sore on his left buttock for extended periods of time.  Defendant did not order this custody van for transport.  Defendant resubmitted the request for service for transport by ambulance to the appointment in Bakersfield.

///

5

28.     Plaintiff admitted that he twice refused transport to medical appointments due to someone other than Defendant booking the wrong van.  Plaintiff further admitted that these refusals led to delays in his care, and further led to his increased pain.

29.     Throughout November 2018, Defendant continued to meet with Plaintiff, and discussed wound care and pain management with him.  Defendant renewed Plaintiff's wound care orders, monitored Plaintiff's decubitus ulcer, and determined the current wound care regimen was working well due to the shrinkage of the wound and lack of infection.  Plaintiff remained prescribed acetaminophen with codeine and Neurontin throughout November 2018.   Defendant remained concerned about opioid dependence, as Plaintiff was able to function despite his complaints of increased pain.  Plaintiff was scheduled for a surgical evaluation on November 30, 2018.

30.     On December 5, 2018, Plaintiff's surgery appointment was cancelled and rescheduled due to the specialist being pulled away due to an emergency.

31.     On December 11, 2018, Plaintiff was evaluated at the Kentfield Advanced Wound and Burn Center for a surgical consultation.  The attending physician recommended extensive bone debridement and intravenous antibiotics, and also recommended a tertiary site for the surgery due to the need to coordinate multiple specialists for the complex procedure.

32.     On December 19, 2018, Plaintiff met with Defendant and complained of severe pain in his hips and lower pelvis.  Defendant noted recent observations of Plaintiff engaging in activities and moving via wheelchair without obvious signs of pain.  Defendant offered Cymbalta to address Plaintiff's pain, which Plaintiff refused due to it being a psychiatric drug.  Defendant also updated Plaintiff on the recommendation of surgery, and discussed possible locations for the surgery.

33.     On December 21, 2018, Defendant submitted the request for surgery to treat both the osteomyelitis and decubitus ulcer, with a specific request for transport by ambulance for travel exceeding one hour.  The request was approved December 24, 2018.

34.     On December 26, 2018, Defendant met with Plaintiff, who complained of increased pain in his hips and pelvis, particularly at night, that his current pain medications were not mitigating.  Plaintiff again refused psychiatric medication, but agreed to an increased dose of Gabapentin, which Defendant then prescribed.

35.     On January 7, 2019, Defendant met with Plaintiff, who complained of night hip pain, and stated a concern that his pain medication was insufficient.  Defendant remained concerned about opioid tolerance.  Plaintiff agreed to try Elavil for pain management.  Defendant also learned that Plaintiff's previous surgeon in Bakersfield no longer accepted CDCR patients.

/ / /

36.     On January 11, 2019, University of California ("UC"), at Davis informed Nguyen that it could not perform the surgery due to Plaintiff's insurance and medical plan.  The offsite appointment schedulers were tasked with exploring other locations for the surgery.  Plaintiff was informed on January 14, 2019 of the status of the surgery referral.

37.     Between January 14, 2019 and February 4, 2019, Plaintiff met with Defendant on four occasions.  At each appointment Plaintiff was advised of the status of the surgery referral, and Defendant confirmed that Plaintiff was still taking Elavil and acetaminophen with codeine to treat his pain.  Defendant contacted offsite schedulers seeking updates on the surgery referral.

38.     On February 20, 2019, Defendant was informed that referrals to UC Davis, UC San Francisco, California Pacific Medical Center (CPMC) and Stanford University were denied.   Plaintiff was however, scheduled for a plastic surgery consultation at the Brentwood Laser & Aesthetics Center with Dr. Moulton-Barrett. Plaintiff was informed regarding the status of the referral on February 25, 2019.

39.     On March 20, 2019, Plaintiff was evaluated by Dr. Moulton-Barrett, who recommended surgery, a follow-up CT scan, additional labwork, and bi-weekly evaluations after surgery.  In a March 26, 2019 letter, Dr. Moulton-Barrett opined that Plaintiff's wound care treatment was "excellent" and should continue following surgery. Dr. Moulton-Barrett also noted challenges obtaining authorization from surgery sites.

40.     On April 1, 2019, a CT scan was ordered, and scheduled for April 12, 2019.

41.     On April 12, 2019, Plaintiff underwent a CT scan.  Defendant renewed Plaintiff's prescription for acetaminophen with codeine.  On April 15, 2019, Defendant met with Plaintiff and discuss his continuing on Elavil, and to discuss a new concern regarding Plaintiff's wound emitting odor.

42.     On April 29, 2019, Defendant met with Plaintiff, and they discussed the pending plastic surgery appointment, and pain management.  Plaintiff indicated his pain issues remained, and he agreed to remain on Elavil.  Defendant noted the CT scan revealed that pelvic bone inflammation and ulceration appeared improved when compared with the August 24, 2018 CT scan results. Defendant further noted that when Plaintiff reported to Dr. Karan on April 22, 2019 that his pain was well controlled.

43.     On May 6, 2019, Defendant learned that the requested plastic surgery procedure was approved, and pending scheduling.

44.     Between May 8, 2019 and May 14, 2019, Plaintiff was hospitalized due to sepsis, hematuria, and catheter cystitis, conditions unrelated to osteomyelitis and decubitus ulcer.  Following his return from the hospital, Defendant noted that surgery referral at UC San

Francisco was approved, but had not yet been scheduled.

45.     On May 24, 2019, Defendant noted that Plaintiff's surgery was still pending scheduling, and that the decubitus ulcer, though persistent, was slowly healing and did not appear infected. On May 31, 2019, an additional six weeks of bacterial antibiotics were ordered to treat the osteomyelitis.

46.     Between June 3, 2019 and June 6, 2019, Defendant followed up with schedulers to determine status of the plastic surgery scheduling. Defendant learned that the request to facilitate surgery at San Leandro Surgery Center, Dr. Moulton-Barrett's recommended site, was denied. Dr. Moulton-Barrett was asked by the scheduling team to consider performing the surgery at one of CHCF's contracted hospitals, which Moulton-Barrett declined. Defendant then directed the schedulers to notify him regarding the surgery request submitted to Highland Hospital. On June 7, 2019, Plaintiff was informed that Dr. Moulton-Barrett could not perform the surgery, and that further steps would be taken to find an alternate surgery location, to which Plaintiff was agreeable.

47.     At appointments on June 10, 2019 and June 14, 2019, Defendant noted that Plaintiff's decubitus ulcer was persistent, but slowly healing. Defendant confirmed that schedulers had requested an alternate location for the surgery.

48.     Between July 4, 2019 and July 8, 2019, Plaintiff was treated at SJGH for sepsis. Following his release from SJGH, on July 12, 2019, Plaintiff met with Defendant, who determined Plaintiff was stable, and that the schedulers had confirmed a specialist's availability for surgical consultation.

49.     On July 19, 2019, Defendant noted that Plaintiff remained stable, but did not want to resume amitriptyline for pain management due to drowsiness side effects.

50.     On July 22, 2019, Defendant renewed Plaintiff's acetaminophen with codeine prescription, and allowed more frequent administrations of the drug due to a recent increase in pain.

51.     On July 26, 2019, Defendant met with Plaintiff, and prescribed naproxen for seven days to address breakthrough hip pain. Defendant also confirmed an x-ray was scheduled for August 1, 2019 to rule out a spread of osteomyelitis.

52.     During encounters on July 29, 2019 and July 30, 2019, Plaintiff reported that naproxen was not providing adequate pain relief. Plaintiff was agreeable to trying alternatives of NSAIDS and ibuprofen for pain relief. Ibuprofen was prescribed.

53.     On August 1, 2019, Plaintiff underwent an [sic] x-rays of his lumbar spine. The impression was minimal multilevel endplate degenerative disc disease, unrelated to Plaintiff's Osteomyelitis.

/ / /

54.     On August 2, 2019, Plaintiff continued to complain of hip pain and lower back pain.  Plaintiff agreed to try ibuprofen on a schedule, which Defendant prescribed.

55.     Plaintiff testified that he believed it took too long to schedule his surgery, but acknowledged that Defendant was responsive to each of his requests for help, and that he was unaware of anything Defendant should have done differently.

56.     Plaintiff testified that Defendant was responsive to his requests for help to resolve pain, and that at no time was he denied help.

57.     Plaintiff testified that he never specifically requested a stronger pain medication than the acetaminophen with codeine prescribed by Defendant.

58.     Norco and Soma were inappropriate pain management options under CDCR policies, and would have caused increased dependence on opiates over time to achieve necessary pain relief due to the increase tolerance with stronger opioids.  It is medically appropriate in cases of suspected opioid addiction and increased tolerance, to explore alternative methods of pain treatment.

59.     Defendant renewed prescriptions for acetaminophen with codeine multiple times, and adjusted the dose downward only when concerned about Plaintiff's increased opioid dependence.

60.     Nguyen continued to monitor the status of the requests for surgery, while meeting and communicating with Plaintiff regularly, and consulting other medical professionals at CHCF and outside of CDCR.

61.     Defendant provided appropriate medical care to Plaintiff, and at no time did he disregard Plaintiff's medical needs.

ECF No. 25-3.

Plaintiff has not opposed Defendant's motion nor disputed any of Defendant's facts.


### III. STANDARD FOR SUMMARY JUDGEMENT

The Federal Rules of Civil Procedure provide for summary judgment or summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  The

1   standard for summary judgment and summary adjudication is the same.  See Fed. R. Civ. P.

2   56(a), 56(c); see also Mora v. ChemTronics, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998).  One of

3   the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  See

4   Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Under summary judgment practice, the

5   moving party

6           . . . always bears the initial responsibility of informing the district court of
            the basis for its motion, and identifying those portions of "the pleadings,
7           depositions, answers to interrogatories, and admissions on file, together
            with the affidavits, if any," which it believes demonstrate the absence of a
8           genuine issue of material fact.

9   Id., at 323 (quoting former Fed. R. Civ. P. 56(c)); see also Fed. R. Civ. P. 56(c)(1).

10          If the moving party meets its initial responsibility, the burden then shifts to the

11  opposing party to establish that a genuine issue as to any material fact actually does exist.  See

12  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

13  establish the existence of this factual dispute, the opposing party may not rely upon the

14  allegations or denials of its pleadings but is required to tender evidence of specific facts in the

15  form of affidavits, and/or admissible discovery material, in support of its contention that the

16  dispute exists.  See Fed. R. Civ. P. 56(c)(1); see also Matsushita, 475 U.S. at 586 n.11.  The

17  opposing party must demonstrate that the fact in contention is material, i.e., a fact that might

18  affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S.

19  242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th

20  Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

21  return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

22  (9th Cir. 1987).  To demonstrate that an issue is genuine, the opposing party "must do more than

23  simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record

24  taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

25  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).  It is sufficient that "the

26  claimed factual dispute be shown to require a trier of fact to resolve the parties' differing versions

27  of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.

28  / / /

                                        10

1    In resolving the summary judgment motion, the court examines the pleadings,

2    depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.

3    See Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed, see Anderson,

4    477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the

5    court must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587.

6    Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

7    produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

8    Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

9    1987).  Ultimately, "[b]efore the evidence is left to the jury, there is a preliminary question for the

10   judge, not whether there is literally no evidence, but whether there is any upon which a jury could

11   properly proceed to find a verdict for the party producing it, upon whom the onus of proof is

12   imposed." Anderson, 477 U.S. at 251.

13

14                                    **IV. DISUCSSION**

15   Defendant Nguyen argues that he was not deliberately indifferent to Plaintiff's

16   medical needs.  See ECF No. 25-2, pg. 14.  Defendant further argues that he was diligent and

17   followed CDCR Guidelines for treating Plaintiff's conditions; therefore, he should be entitled to

18   qualified immunity.  See id. at 19.

19              A.        **Medical Needs**

20                        The treatment a prisoner receives in prison and the conditions under which the

21   prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel

22   and unusual punishment.   See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan,

23   511 U.S. 825, 832 (1994).  The Eighth Amendment ". . . embodies broad and idealistic concepts

24   of dignity, civilized standards, humanity, and decency."  Estelle v. Gamble, 429 U.S. 97, 102

25   (1976).  Conditions of confinement may, however, be harsh and restrictive.  See Rhodes v.

26   Chapman, 452 U.S. 337, 347 (1981).  Nonetheless, prison officials must provide prisoners with

27   "food, clothing, shelter, sanitation, medical care, and personal safety."  Toussaint v. McCarthy,

28   801 F.2d 1080, 1107 (9th Cir. 1986).  A prison official violates the Eighth Amendment only when

                                             11

1  two requirements are met: (1) objectively, the official's act or omission must be so serious such

2  that it results in the denial of the minimal civilized measure of life's necessities; and (2)

3  subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of

4  inflicting harm.  See Farmer, 511 U.S. at 834.  Thus, to violate the Eighth Amendment, a prison

5  official must have a "sufficiently culpable mind."  See id.

6          Deliberate indifference to a prisoner's serious illness or injury, or risks of serious

7  injury or illness, gives rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at 105;

8  see also Farmer, 511 U.S. at 837.  This applies to physical as well as dental and mental health

9  needs.  See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982), abrogated on other grounds by

10  Sandin v. Conner, 515 U.S. 472 (1995).  An injury or illness is sufficiently serious if the failure to

11  treat a prisoner's condition could result in further significant injury or the ". . . unnecessary and

12  wanton infliction of pain."  McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled

13  on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc); see

14  also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994).  Factors indicating seriousness

15  are: (1) whether a reasonable doctor would think that the condition is worthy of comment; (2)

16  whether the condition significantly impacts the prisoner's daily activities; and (3) whether the

17  condition is chronic and accompanied by substantial pain.  See Lopez v. Smith, 203 F.3d 1122,

18  1131-32 (9th Cir. 2000) (en banc).

19          The requirement of deliberate indifference is less stringent in medical needs cases

20  than in other Eighth Amendment contexts because the responsibility to provide inmates with

21  medical care does not generally conflict with competing penological concerns.  See McGuckin,

22  974 F.2d at 1060.  Thus, deference need not be given to the judgment of prison officials as to

23  decisions concerning medical needs.  See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir.

24  1989).  The complete denial of medical attention may constitute deliberate indifference.  See

25  Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986).  Delay in providing medical

26  treatment, or interference with medical treatment, may also constitute deliberate indifference.  See

27  Lopez, 203 F.3d at 1131.  Where delay is alleged, however, the prisoner must also demonstrate

28  that the delay led to further injury.  See McGuckin, 974 F.2d at 1060.

1    Negligence in diagnosing or treating a medical condition does not, however, give

2    rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at 106.  Moreover, a

3    difference of opinion between the prisoner and medical providers concerning the appropriate

4    course of treatment does not give rise to an Eighth Amendment claim.  See Jackson v. McIntosh,

5    90 F.3d 330, 332 (9th Cir. 1996).

6    Here, the undisputed evidence shows that Defendant Nguyen was aware of

7    Plaintiff's medical needs and took reasonable measures to treat them.  Defendant Nguyen met

8    with Plaintiff regularly, discussed his plan for care, offered and prescribed multiple non-opiate

9    pain management options to supplement the acetaminophen with codeine prescription, and

10   diligently pursued surgical options throughout despite scheduling obstacles that were beyond his

11   control.  The undisputed evidence shows that Defendant Nguyen consistently monitored

12   Plaintiff's wound care and recommended antibiotics and additional treatment to address the

13   wound.

14   Further, none of the delays were attributable to Defendant Nguyen.  Defendant

15   Nguyen submitted a request for surgery within four days of his first encounter with Plaintiff.

16   Delays resulted from the complexity of Plaintiff's surgery, unexpected cancellations, coordination

17   issues, and finding a site to perform the surgery.  Throughout this process, Defendant Nguyen

18   submitted timely requests for surgery, followed up to obtain approval following a denial, and

19   communicated often with the schedulers to obtain updates.  Additionally, Dr. Moulton-Barrett

20   refused to perform surgery, and Plaintiff's hospitalization further complicated scheduling issues.

21   None of the delays were attributable to Defendant Nguyen.  Therefore, Defendant Nguyen was

22   not deliberately indifferent to Plaintiff's medical needs.

23   **B.    Qualified Immunity**

24   Government officials enjoy qualified immunity from civil damages unless their

25   conduct violates "clearly established statutory or constitutional rights of which a reasonable

26   person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In general,

27   qualified immunity protects "all but the plainly incompetent or those who knowingly violate the

28   law." Malley v. Briggs, 475 U.S. 335, 341 (1986).  In ruling upon the issue of qualified

immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the defendant's conduct violated a constitutional right.  See <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).  If a violation can be made out, the next step is to ask whether the right was clearly established.  See <u>id.</u>  This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ."  <u>Id.</u>  "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense:  The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  <u>Id.</u> at 202 (citation omitted).  Thus, the final step in the analysis is to determine whether a reasonable officer in similar circumstances would have thought his conduct violated the alleged right.  See <u>id.</u> at 205.

When identifying the right allegedly violated, the court must define the right more narrowly than the constitutional provision guaranteeing the right, but more broadly than the factual circumstances surrounding the alleged violation.  See <u>Kelly v. Borg</u>, 60 F.3d 664, 667 (9th Cir. 1995).  For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand [that] what [the official] is doing violates the right."  See <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987).  Ordinarily, once the court concludes that a right was clearly established, an officer is not entitled to qualified immunity because a reasonably competent public official is charged with knowing the law governing his conduct.  See <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818-19 (1982).  However, even if the plaintiff has alleged a violation of a clearly established right, the government official is entitled to qualified immunity if he could have ". . . reasonably but mistakenly believed that his . . . conduct did not violate the right."  <u>Jackson v. City of Bremerton</u>, 268 F.3d 646, 651 (9th Cir. 2001); <u>see also</u> <u>Saucier</u>, 533 U.S. at 205.

The first factors in the qualified immunity analysis involve purely legal questions.  See <u>Trevino v. Gates</u>, 99 F.3d 911, 917 (9th Cir. 1996).  The third inquiry involves a legal determination based on a prior factual finding as to the reasonableness of the government official's conduct.  See <u>Neely v. Feinstein</u>, 50 F.3d 1502, 1509 (9th Cir. 1995).  The district court has discretion to determine which of the <u>Saucier</u> factors to analyze first.  See <u>Pearson v. Callahan</u>,

14

1   555 U.S. 223, 236 (2009).  In resolving these issues, the court must view the evidence in the light

2   most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff.  See

3   Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

4               Qualified immunity shields government officials who, in the face of clearly

5   established law, acted reasonably but nonetheless violated some constitutional right.  Here,

6   Defendant assessed Plaintiff's conditions and the status of surgical referrals consistently and

7   often. He offered multiple options to address Plaintiff's pain while awaiting surgery.  Plaintiff's

8   claim that the process took too long is rebutted by evidence that Defendant Nguyen was

9   responsive to each of his requests, never denied Plaintiff's requests for help, and that delays in

10  scheduling surgery appointments were not attributable to Defendant Nguyen.  The undisputed

11  evidence shows the Defendant did not violate Plaintiff's rights.  Therefore, qualified immunity is

12  not an issue in this case.  And even if the Court concluded the Defendant did violate a clearly

13  established rights, Defendant would be entitled to qualified immunity because the evidence shows

14  that Defendant acted reasonably by appropriately treating Plaintiff's medical concerns within the

15  CDCR guidelines.

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1

## V. CONCLUSION

2          Based on the foregoing, the undersigned recommends that:

3          1.          Defendant Nguyen's unopposed motion for summary judgment, ECF No. 25,

4   be granted; and

5          2.          Judgment be entered as a matter of law in favor of Defendant Nguyen.

6          These findings and recommendations are submitted to the United States District

7   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within 14 days

8   after being served with these findings and recommendations, any party may file written objections

9   with the court.  Responses to objections shall be filed within 14 days after service of objections.

10  Failure to file objections within the specified time may waive the right to appeal.  See Martinez v.

11  Y1st, 951 F.2d 1153 (9th Cir. 1991).

12

13  Dated:  February 11, 2022

14
                                             DENNIS M. COTA
15                                           UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28